114-3209, KH Ryan Cartage v. Drivers Services, Part B. Counsel, you may proceed. Good morning, Your Honors. Counsel, may it please the Court? My name is Kathleen Hobson. I'm from the offices of Meacham, Stark, Boyle, and Traffman.  My firm substituted in after the briefs were written, so just for the record, if you need it, it's Kathleen, C-A-T-H-L-E-E-N, Hobson, H-O-B-S-O-N. Your Honors, this comes before you on our appeal. I represent the employer, and it's our appeal of a 19-B decision. We have two average weekly wage calculation issues that we've raised, and also an 8-J credit. The first issue is... Can we get rid of the 8-J credit first? I'm sorry, Your Honor? Can we get rid of the 8-J credit first? Okay, with regard to... Did you reduce any evidence before the arbitrator that that $9,000 bill was paid? We did not present it at the time of the arbitration. Then you can go back and get your 8-J credit on remand. Because you would have had to have evidence that the 96-37 had been paid before you would be entitled to a credit. They gave you a credit for... You were ordered to pay $113,632. You were given a credit for $103,995, which you established were in fact paid. The Commission found that the $9,637,000 was a legitimate medical expense, but you introduced no evidence that it was paid by your third-party payer, and consequently they can't give you a credit for something you didn't pay. So you can go back on remand, and you can go and ask them for a credit when you prove it's paid. So now let's get to the question of average weekly wage. Certainly. Thank you, Your Honor. And yes, that is what we're asking, to go back on remand and be able to establish our credits. Well, you certainly can. It's been remanded for that purpose, so you can do that. Thank you. With regards to the average weekly wage, our starting point obviously is Section 10, where overtime is excluded from the average weekly wage calculation. Since overtime is not defined, this Court has defined overtime, and that's defined as compensation for any hours beyond those that the claimant regularly works and extra pay above normal hourly wage. And so this sort of turns on the facts, doesn't it? I mean, the claimant testified he was told by Mr. Parker when he was hired he would have to work all the hours he was given, meaning in excess of eight hours. He testified as to that. Obviously, Parker and Ryan disputed the claimant's testimony in this regard and testified it was voluntary. And the Commission chose to believe the claimant over Parker and the other gentlemen. So why couldn't they do that? The Commission does resolve conflicts in the testimonial evidence. And the credibility of witnesses. And the credibility of witnesses, yes, Your Honor. It's very clearly the Commission adopted the arbitrator's decision, so they did say that they found that the petitioner was more credible. So where does that leave you? That leaves us here with a matter of proof. Because they not only had the conflicting testimonial evidence from the parties, so there was no independent witness, it was party witnesses. Right, right. You had documentary evidence. And then you have the application of what this Court has defined as basically the Court has gone on to further define what overtime is, so that in situations where, you know, because labor laws require you pay overtime in certain situations, I think the Court has carved out certain exceptions so that if something technically fits into overtime, it could still be calculated into an employee's average weekly wage. But he testified that he was told that he had to work all of the hours given to him out of the barn. And that means he was told he had to work all the overtime. Because those were obviously hours given to him out of the barn. It wasn't private or somebody else. And the Commission chose to believe him. And so if the Commission believes that he was required to work all of the hours that he was given, and he was given the overtime hours, then in that particular case it would be included within his average weekly wage because he was required to work it. With all due respect, Your Honor, that's not the end of the analysis, though, because that is not all the evidence in the case. No, no. We know that may not be all the evidence in the case. The Commission could have decided in the other direction, too, but they believed him. And when they believed him, tell me why they couldn't believe him. Because there was no further testimony as to specifically what those hours were and when that overtime occurred. We know how many hours he worked. And we know how many hours were overtime. We know from the record what he worked. Yes, you know how many hours he worked that you don't know because his testimony was also that he wanted to voluntarily work overtime to make extra money. And so that's what the issue is here because you have cases where if an employee is mandated to work overtime, if you're scheduled to work overtime, the case where the employee was scheduled to work 12-hour shifts on occasion, but then there were other times that he volunteered to work overtime. Okay, so you're pushing it out that there are two elements of overtime you think present in this case, voluntary and mandatory. Is that correct? Well, first, you wouldn't agree that it's mandatory. No, I wouldn't agree that it's mandatory because I think his testimony is that he also worked overtime in order to make extra money. So I don't think that in order to establish that. So your fallback position is that maybe some of it he was required to do, but he admitted that there was some voluntary overtime as well and that the documentary evidence is insufficient to tell which is which? I would not say that it's a fallback position. What I go back to is what has been defined as the exceptions for the overtime, which is it's a condition of employment that you're required to work overtime. We've got to start from the basic proposition that they believed him. They did not believe Parker. So that means that we have to start from the position that he was required to work whatever overtime he was given. You're going nowhere trying to argue that he didn't have to work overtime. So now the question becomes, is there evidence in the record that some of the overtime that he worked was because he requested it? I think what his testimony was is he didn't object to working overtime and that he was required to work all of the hours that were given to him out of the barn, which would be including anything in excess of eight hours. They gave him the work to do, and according to his testimony, he had to do it. He didn't mind doing it, but he had to do it. A couple of times he testified that he asked, did he really have to do it? And the dispatcher told him, we need you, you've got to do it, I think was his exact quote. So now the question becomes, where is the evidence that he worked overtime that he wasn't ordered to work? Where is this coming from that he worked voluntarily? Where it's coming from is what I'm looking at is the documentary evidence. We have evidence here because there is a collective bargaining agreement, a collective bargaining agreement that sets the conditions of his employment. And in that collective bargaining agreement, you have not been provided with anything saying that he's required to work overtime. Now, I know that the commission, I wanted to address some of the things that the commission said about the collective bargaining agreement, and one thing I would like to point out is that the collective bargaining agreement as a contract, you are not required, I do not believe, to follow what the commission decided as far as what that collective bargaining agreement means. I think that the court always is entitled to review contract de novo. So in that context. What does it say in the collective bargaining agreement that he's not required to work overtime? What does it say that he does, is required, Your Honor? What it says in here is that straight time work consists of five days, Monday through Friday, inclusive of eight-hour continuous days. On the subject of overtime, the only thing it says is the union reserves the right to file a grievance against any employer who consistently insists that an employee work ten or more hours in any one day. That's exactly what the collective bargaining agreement says. It doesn't say that he doesn't have to work overtime, that he could refuse to work overtime. It merely says they could file a grievance if they work more than ten hours a day. That's all it says. So there is nothing in this collective bargaining agreement that says he doesn't have to work overtime. How does that trump the commission's decision? They believe that he was required to work overtime. That doesn't preclude him from working overtime. Your position is that some of these hours, as I understand it, may have been voluntary, but then you sidestepped the question, where is it in the record that it's testified to that some of these hours he volunteered for? Where does it say that? Did he ever testify to the claimant that he volunteered for some of these hours or not? He testified that he was working some of the extra hours because he wanted to make more money. So the inference is it was voluntary? Yes, sir. Some of the hours, but you can't call a retention. How do you call that out? You can't parse it out, and that's part of my point, is you can't parse out what part is voluntary and what part is what he's claiming is mandatory. Also, with regards to the collective bargaining agreement, it provides that in the overtime section that he has a daily guarantee of eight hours, so that means that his... We know his regular workday is eight hours. We know that's his straight time. Nobody's disputing that. The dispute is you said that he didn't have to work overtime because of the collective bargaining agreement, and I only ask you where does it say that? And I'm talking about the matter of proof here, so I'm not saying that it's one specific thing. I'm looking at the totality of what that means. But that's what the commission does, and the commission has to draw inferences. The man never said he volunteered to work overtime. The man said he didn't mind working overtime because he liked working, making extra money. But that doesn't mean he wasn't ordered to do it, does it? It's an absence of evidence. I mean, it's not clear. You could infer that, but the commission is the one that's got to make the inference. Yes. But they didn't approve on appeal. You're saying, well, it can't be parsed out. Well, if you're trying to overturn the commission's decision on a manifest wage standard, I suggest you have the burden of being able to... Right, and what I'm saying is I'm trying to get to my point of what the documentary evidence is here. And so I think that you have to look at the documentary evidence. You have conflicting parties, conflicting testimony. The documentary evidence shows that he volunteered. That's what we're talking about. Yeah, and I'm talking about documentary evidence showing that it's a condition of his employment that he's required to work overtime. There is none. It should be in his collective bargaining agreement, like it was in that other case. You mean to say if it's not in the collective bargaining agreement, the commission can't believe him when he testified, Parker told him he had to work overtime? It's a matter of proof. The commission decides what to believe. Us? No. The commission. But the commission didn't... The commission interpreted the collective bargaining agreement in a different manner. And what I'm saying... Let me ask, let's stop you right there. How did they interpret the collective bargaining agreement? What did they say they... What was their interpretation of the agreement? The commission said that part of the bargaining agreement where it said the union reserves the right to file a grievance against any employer who consistently insists that an employee work more than 10 hours in one day. So that's the quote from the bargaining agreement. The commission said that that meant the employer could require the employee to work more than eight hours, but could not require him to work more than 10 hours. Well, they could file a grievance and work more than 10, but the employer under this collective bargaining agreement could insist that their employees work nine hours a day. Of course. And there would be no grievance. And what I'm saying is that was a part of the commission's, the basis of their decision was that interpretation. And I'm saying that interpretation doesn't mean it's a condition of the employment. No, no, no. We know that it's not a condition of the employment. The condition of the employment was made based upon his testimony versus Parker's. That's where the condition of the employment came from, not from the employment agreement. The employment agreement doesn't say he doesn't have to work overtime. And the employment agreement, I guess, says that they can file a grievance if they work more than 10 hours. But it doesn't anywhere in this agreement say they can't require him to work overtime, his regular straight time as they go. And whether it's a condition of his employment is exclusively a debate between him and Parker. And the commission believes Parker. So let's assume for a moment that we take the basic proposition that the commission determined the credibility of the witnesses and we have to believe what he testified. He was told he had to work every hour he was given out of the barn. So now the question becomes what's wrong with their calculation of the average weekly wage? Do you want me to move on to the second issue? I suggest you better because you're going to run out of time. Okay. Well, with regards to the calculation, when the commission on remand, when they explained how they calculated it, they used the wrong basis for it. They lowered it to 14 and two-sevenths week. That part of Section 10 says that when the employees worked for a period of less than 52 weeks, the method of dividing the earnings is by the number of weeks and parts thereof. I provided you, we provided you with the Cook case in our brief, and I believe that the Cook case shows that if you can't determine exactly which days the employee worked, which there were two weeks that were not full weeks, that you count all of the weeks that they worked. And then we gave you the cases where they did parse out how many days per week, that there was evidence as to specifically which days were worked. And here the petitioner was not specific as to what days he worked. All we have is the summary wage statement, which are weekly summaries, so there's nothing to base that on. And so we believe that it's both by under Cook, the interpretation should be the 16 weeks. You wanted 16 weeks. Taking the calendar weeks, they're exactly the argument that we rejected in both Silvestri and Graney, isn't it? Wasn't that where they had the exact evidence of what the days were? We know how many hours this man worked. We know how many hours were overtime from his wage statement because we know he was paid for those hours. And so what we did was we took, or what they did, was they took the total number of hours that he worked, regular time hours, 571.83 hours, I believe, and he divided that by 8 to determine how many days he'd work. And then they divided that by 5 because he had a 5-day work week, and they came up with 14.27. The math worked perfectly. So that's how they arrived at 14.27. Your argument was, no, no, they shouldn't have used 14.27. They should have used 16 weeks because he actually earned wages in 16 calendar weeks. I think that's what your brief argument is. And that we rejected in Silvestri and Graney. We said that's not the way it works. But the way they did it was exactly what I told you, is that math works perfectly. What's wrong with that? Your Honor, I stand on our arguments in our briefs on that issue, that my understanding of the law is if you don't have the exact numbers as far as how many, what he worked for each week, that it goes by the actual weeks worked rather than calculating. Well, we know that he worked full work weeks in how many of the weeks? Let's see. There were two weeks where he didn't work full weeks. Well, three weeks counting the week of the accident. All right. Let's see if I can figure it out here. Your time is up. You don't have time to respond. Do you have time? Yes, yes. Okay. Thanks, Your Honor. Counsel, you may respond. May it please the Court, Counsel. My name is Paul Coghlan, and I represent Mr. Reed. I've been patiently waiting for my chance on the balance team this morning. The notion of stealing defeat from the jaws of victory comes to mind, so I'm going to allow you to speak. Don't get that. Don't be so sure based on the questions. You'll be stealing defeat from the jaws of victory. Justice Hoffman, I said that. How did they get to the 14 and two-sevenths, and why is that the correct contradiction? You can clearly tell the eight-hour days were the regular. That's how you can figure out the days he worked. You look at the eight hours, because for purposes of payroll, overtime begins after the eighth hour. It's not that difficult to figure out. If he worked four days instead of five, it would be 32 hours. Full week would be 40 hours. This is not rocket science in this case. These calculations were quite simple. And I point out, I thought that I had lost on this issue because this gentleman has never been, he's still on TTD right now. This was a very, very bad career-ending injury. I argued that they should have used the wages of a comfortably employed employer with more tenure and not used the entrance wages to fairly compensate him given the severity of the injury, and I lost on that. And here we are. They're still complaining about having this guy, who's never been back to work since this accident occurred, being paid at the entry rate at working the exact hours they told him he was going to be working when he was hired, which, by the way, he has sole custody of a young boy. He told them the reason he wanted to start this job versus another job is because he had to be home for his child to meet the child after school because they only have a certain number of time for somebody to watch a man for school. So he couldn't be out on the road until 8 o'clock or 9 o'clock. He had to pick up his son. That's all in the record. Let me ask you the other issue that counsel spent a great deal of time on. We had stated clearly there was a conflict in the testimony between Ryan Parker and your client. Commission chose to believe your client on the issue of whether or not he was required to work overtime. Counsel spent a lot of time talking about a union agreement. I'm not clear. What impact, if any, does that union agreement have on the issue of him working overtime, if at all? The union agreement, and they were throwing these documents at me. I didn't know we were going to have a union agreement that day. I'm reading it as we're trying the case, literally, and I open it up. I was expecting it to support their argument that overtime is 40 hours a week. Lo and behold, you can't even complain. You can't even complain about a grievance unless it's consistently in excess of 50, which fits Mr. Reed's testimony that they told him he had to work 50 hours a week. So that agreement, in essence, doesn't preclude him working overtime. It buttresses my client's testimony. Almost to the minute, as far as what they told him, he was going to be working. You look at the union agreement, and it looks like the company was well within their province to ask him to work that under the collective bargaining agreement. And that's the first question I asked when they started throwing these agreements at me, and particularly the company's handbook, which the company has complete discretion to publish that. They don't have complete discretion to put whatever they want in the union handbook. But certainly, their own company handbook, they can put in there whatever they want. I'm going to ask the guy, Mr. Parker, if the policy is overtime starts after 40 hours, why didn't you put that in your handbook? Why didn't you put that in your handbook? It's not what it says. It says employees may be asked to work additional hours. That's all. All right, so the union thing is a red herring. It doesn't preclude overtime at all. Is that correct? Absolutely not. Absolutely not. But, you know, it is consistent with, it essentially vindicates the company's right, under the union collective bargaining agreement, to say what they said to Mr. Reed at the time he was hired without running afoul of the collective bargaining agreement. I'm not suggesting that they did anything wrong under the collective bargaining agreement, but by the same token, they can't use that, you know, to knock out the overtime either because it just doesn't address what happened in the situation or disprove in any way what Mr. Reed testified to as far as the hours he wanted. And, you know, to suggest that the commission, the commission is required under the statute to calculate by weeks and parts. That's right in the statute. To suggest that they somehow erred by following the statute, I think, is disingenuous as far as calculating the average weekly wage. And as you point out, the HA credit is not an issue. And, in fact, it's not even an HA credit. An HA credit deals with group payments. It does not deal with payments made by the carrier. They could get a credit. However, if they paid something after… Hold on, hold on, hold on. Stay away from the HA credit. There was no evidence the bill was even paid at arbitration. They can't get a credit up here. You can argue that when it goes back. Okay. But get to the calculation. How did they do it? So they took the straight time based upon the numbers of weeks and they added in the additional hours. It's not that hard to figure it out. And they came up with, it's almost exactly like he testified, I think it's around 50 or 51 hours. The original difference, by the way, in case you're wondering how we got from 812.50 to 808.32, there were two separate companies here. There was LD and there was T.H. Ryan. He was pulling for both of them on different dates. It's a sister company. They were on two different sets of books. Originally, it doesn't really make a whole lot of difference whether you combine them or you look at them separately because he was making the same amount for both. He was working the same amount of hours for both. Originally, I thought since he was, since they stipulated he was working on 19B for, I think it was LD services, and since it was fewer weeks, it was easier to calculate. We originally calculated that's how they got that 808.32. It was a rough number. It was a simpler number, just the one. On remanding, the commission took both together, which I don't have a problem. I think there is some case law. I think you recently held a different case when a person is concurrently employed. You can use both of the hearings. So I think that that passes muster. And I didn't object to it. It's not a big difference anyways. But they did take both LD and the earnings from LD and T.H. Ryan, and they took out the halftime. They kept the straight days. They subtracted out the days he did not work, and it went from a set of 16 weeks total. This isn't a huge period of time here. It was whatever it was. It was a week and three. It was eight days that he wasn't there. They subtracted those out, and they divided by the number of days that he did work. And lo and behold, it's almost exactly the 50 or 51 hours, whatever it was, that it testified he was hired to. It all matches up. Any justices have any questions? I don't think so, counsel. Thank you. Thank you for your time. Counsel, you may reply. All right. Thank you, Your Honors. I wanted to address, counsel mentioned the employee handbook, and that was part of one of my problems with the commission's decision. The commission quoted the employee handbook where it says that employees may be asked and then pointed out that the employer could have stated all hours beyond eight are voluntary and that they would construe this against the respondent as the ones who drafted this document. There's no testimony or anything that the employee handbook is even a binding contract. I don't think it was proper for the commission to use principles of contract construction on this employee handbook. And I think that if it is a condition of disemployment, that I think you would see, and mainly because there's a collective bargaining agreement, it would be in the collective bargaining agreement that it's a condition of disemployment and a requirement, but you would also affirmatively see it in the employee handbook. And so that's the point that I was trying to get to, is that in order for the petitioner to establish that their overtime should be included in the average weekly wage, I think there needs to be affirmative proof. And I know that we have the conflicting testimonial evidence that's been resolved in their favor, but then when you have an employee handbook that makes no mention... The employee handbook has nothing to do with it. The collective agreement has nothing to do with it. This is a very simple case. You seem to be saying, aha, we have a handbook and we have this other document and therefore somehow they're going to control the result here. Very simple. Your boss tells you you've got to work the hours required, you do it. It's got nothing to do with the handbook. It's got nothing to do with an agreement. And then my other... I mean, that's it. It's very simple. It's testimonial. That's all he needs. My other point that I would just like to ask the Court to make sure to consider is that these hours vary greatly from week to week, and you do have other cases where you've decided that when those hours have varied from week to week that there is not enough evidence showing that it is required and mandatory. So I would just ask you to take a look at that. And we presented in our briefs what we've requested from you, so I'll rest on that. Thank you. Thank you, Counsel. Thank you, Counsel, both for your arguments in this matter. We'll be taking our advisement that this position shall issue.